



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

KATHRYN BLYTHE,

                                              Plaintiff

     -Against-

THE CITY OF NEW YORK, THE NEW YORK CITY
DEPARTMENT OF EDUCATION, *and* RAFAELA
ESPINAL-PACHECO, *in individual capacity,*
VICKY BROADHURST, *in individual capacity, and*
OFFICER MATHEW POMEIJOU, in his individual
capacity,

                                              Defendants
-------------------------------------------------------------------X

COMPLAINT
JURY TRIAL DEMANDED





MAUSKOPF, J.

Plaintiff, KATHRYN BLYTHE, by her attorneys, LAW OFFICES OF AMBROSE

WOTORSON, alleges as follows:

I.     INTRODUCTION

1.     This is an action brought pursuant to 42 U.S.C. Sections 1983 and 1981 to

vindicate the civil rights of plaintiff. Plaintiff contends that defendants altered the terms,

conditions, and privileges of her municipal employment in violation of her liberty interest rights,

and on account of her opposition to what she reasonably regarded as racial discrimination.

II.     JURISDICTION

2.     This Court has jurisdiction over this action under 42 U.S.C. Sections 1983 and

1981. Venue is proper, as the operative events occurred within this judicial district.

III.     PARTIES

3.     KATHRYN BLYTHE (hereinafter, "plaintiff") who resides in Hudson County,

New Jersey, hereby sues in on her own behalf.

4.    CITY OF NEW YORK is a state actor for 42 U.S.C. Section 1983 purposes.

Defendant may sue and be sued, and its principle place of business is in New York County, New

York. At all relevant times, the CITY OF NEW YORK employed the individual defendants

listed herein. The CITY OF NEW YORK is herein sued for having violated plaintiff's civil rights

while acting under color of state law and/or acting pursuant to its own practices, customs and

policies

5.    THE NEW YORK CITY DEPARTMENT OF EDUCATION, (hereinafter,

"municipal defendant") is a state actor for 42 U.S.C. Section 1983 purposes. Defendant may sue

and be sued, and its principle place of business is in Kings County, New York and defendant's

address is 65 Court Street, Brooklyn, New York 11201. At all relevant times, THE NEW YORK

CITY DEPARTMENT OF EDUCATION employed plaintiff as a Teacher. THE NEW YORK

CITY DEPARTMENT OF EDUCATION is herein being sued for having violated plaintiff's

civil rights while acting under color of state law and/or acting pursuant to its own practices,

customs and policies.

6.    Defendant, RAFAELA ESPINAL-PACHECO, *in her individual capacity*, at all

relevant times, was employed by municipal defendant as a School Principal with municipal

defendant. She is sued in her individual capacity for violating plaintiff's protected civil rights

while acting under color of state law and/or acting pursuant to practices, customs and policies of

municipal defendant.

7.    Defendant, VICKY BROADHURST, *in her individual capacity*, at all relevant

times, was employed by municipal defendant as an Assistant Principal with municipal defendant.

She is sued in her individual capacity for violating plaintiff's protected civil rights while acting

under color of state law and/or acting pursuant to practices, customs and policies of municipal defendant.

8.      OFFICER MATHEW POMEIJOU, at all relevant times, was employed with the City of New York, as a police officer at the 90th Precinct in Brooklyn, New York. At all relevant times, he acted under color of state law and pursuant to the practices, policies and customs of the City of New York. He is herein sued in his individual capacity.

IV.    FACTUAL AVERMENTS

9.      Plaintiff has been employed by municipal defendant, NEW YORK CITY DEPARTMENT OF EDUCATION for about twenty-three (23) years.

10.    In light of a collective bargaining agreement which mandates that plaintiff cannot be subjected to adverse employment actions without a showing of just cause, and in light of New York Civil Service Law, plaintiff had a protected property interest in her job and position. However, state remedies are wholly inadequate as a matter of law in light of municipal, custom, practice and policy.

11.    Plaintiff's performance has been fully satisfactory at all relevant times.

12.    However, the terms, conditions, and privileges of plaintiff's municipal employment have been adversely affected and his rights were violated in the following ways:

a.      Plaintiff was initially hired by municipal defendant as an elementary school teacher in 1985.

b.      At all relevant times, plaintiff was uniquely qualified to teach elementary students, and she held a Master's Degree in Common Branches and Elementary Education.

c.      At all relevant times, plaintiff was the one of four other African-American female teachers at P.S. 147 in Brooklyn, New York, District 14, Region 8.

d.      At all relevant times, plaintiff's performance as a teacher had been fully satisfactory, prior to the 2004 school year, and prior to Rafaela Espinal-Pacheco becoming the Principal of P.S. 147.

e.      Indeed, for all years prior to Espinal-Pacheco becoming the Principal at P.S. 147, plaintiff received written and oral praise for her work, satisfactory performance evaluations, and glowing observation reports.

f.      Plaintiff's problems began almost immediately when Espinal-Pacheco, who is Hispanic, began serving as Principal.

g.      In or about September 2004, in plaintiff's first face-to-face confrontation with Espinal-Pacheco, plaintiff, a tenured teacher, was assigned to teach a lower grade than plaintiff's usual assignment. Espinal-Pacheco began telling plaintiff that she would be coming around to check on her, and if her work wasn't satisfactory, she could receive a "U." Plaintiff responded that she had always had evaluations, and that they had always been satisfactory, so she was not concerned. To this, Espinal-Pacheco threatened that she could "go after [plaintiff's] license, if she wanted to." Plaintiff neither welcomed nor encouraged this behavior.

h.      In or about January 2005, a grief-stricken parent, Ms. Forrest, came to plaintiff, stating that Principal Espinal-Pacheco had ordered that her son, a nine-year old forth-grader, be sent to Woodhull Medical Center for psychiatric treatment. Plaintiff took time out to console Ms. Forrest, and in

4

January 2005, she testified on Ms. Forrest's behalf at the Department of
Education Hearing against the student. Principal Espinal-Pacheco was
aware that plaintiff had testified in this matter, and that plaintiff opposed
what she perceived to be disparate treatment towards African American
students.

i.    In fact, on several occasions between 2004 and 2006, plaintiff witnessed
Principal Espinal-Pacheco's disparate treatment of Black parents versus
Espinal-Pacheco's treatment of Hispanic parents. Oftentimes, African
American parents were not allowed to visit the classrooms, had to
schedule appointments with the teachers, and the African-American
students were often times disciplined more harshly than Hispanic students.
On the other hand, Hispanic parents were often allowed to come up to the
classrooms at any time to see the teachers, and could often stay for longer
visits. On one occasion, in March of 2005, an African American parent,
Ms. Debman came to visit plaintiff to simply pick up her child's report
card during Parent-Teachers' Week. Principal Espinal-Pacheco came up to
plaintiff's room abruptly and told the parent that she had to leave, and told
plaintiff to "get back to work." At that time, plaintiff spoke to defendant
Espinal-Pacheco in the hallway, and told that her harassment and
disrespect had to stop.

j.    In or about September 2005, plaintiff complained to Principal Espinal-
Pacheco that she had not been assigned a classroom for that school year,
even though they were already two days into the semester, and other

5

similarly-situated Hispanic teachers had their room assignments. Plaintiff also complained that she had to be moved from class to class for the past three years, without any assistance. In fact, many teachers of plaintiff's seniority, who were Hispanic were allowed to keep their same assigned room each school-year.

k. In or about June 2006, plaintiff ran for the position of Chapter Leader. Plaintiff was advocating and speaking up on matters of public concern. Plaintiff often times spoke out against Principal Espinal-Pacheco's punishment of students, disparate treatment between Hispanic and African American parents and students, the principal's interference with the PTA, and the Department of Education cronyism.

l. Thereafter, defendants' pattern of harassment against plaintiff intensified.

m. Indeed, on or about June 19, 2006, plaintiff received a retaliatory letter from Principal Espinal-Pacheco, in which defendant talked about a meeting that she had had with plaintiff on June 1, 2005, *a full year* earlier. In Espinal-Pacheco's letter, she enumerated several instances of misconduct on plaintiff's behalf, claiming that plaintiff had left her class unattended and had refused to monitor the class of another teacher, claiming that plaintiff had excessive absences, and claiming that plaintiff's behavior was uncooperative and unprofessional and constituted insubordination.

n. In fact, plaintiff had never received any written warning with regard to leaving classes unattended, excessive absences, and insubordination.

o.  Indeed, in reference to the incident about unattended classes, which had happened several months before, Plaintiff had supervised another teacher's class, Ms. Morales, a Hispanic woman, for an entire period, along with her own class. On several occasions, plaintiff would monitor another teacher's class if the teacher was running late. However, on this date, Ms. Morales had left her class for an entire period and the class was scheduled for its lunch break. Plaintiff was in no way able to supervise her class, and take Ms. Morales' class to lunch simultaneously. Therefore, plaintiff called down to Ms. Morales and told her that she had to come and pick up her class and take them to lunch. Plaintiff then received this letter from defendant Espinal-Pacheco telling her that she had left the class unattended and had closed the door on the students. On information and belief, Ms. Morales was never reprimanded or disciplined for leaving her own class unattended.

p.  As well, Principal Espinal-Pacheco's June 16, 2006 letter was the first time that plaintiff was reprimanded for excessive absences.

q.  In or about September 2006, plaintiff was re-assigned to a classroom that was on the other side of the building, away from other classrooms, and in an unsecured and unsafe section of the building. Again, Plaintiff orally complained about this mistreatment and harassment.

r.  The charges against plaintiff dated June 22, 2007, claim that plaintiff "threatened to choke teacher Rosemarie Chesson" on or about April 15, 2007. This incident never happened, and by April 15, 2007, plaintiff had

already been reassigned to the "rubber room." This only underscores the
lengths to which defendants are prepared to engage in dishonest, illegal
and retaliatory misconduct against plaintiff.

s.   On February 15, 2007, plaintiff called Ms. Santiago, the parent
coordinator, and complained that a six year old student had been getting
up and leaving the classroom consistently. On numerous occasions, prior
to this incident, plaintiff had informed the child's mother, Ms. Reese, that
the child had been rude and disruptive and would get up and leave the
class without permission. In fact, on February 15, 2007, plaintiff requested
that the child's father be contacted several times.

t.   At about approximately 10:25 a.m., on February 15, 2007, the student's
father came to the school and spoke with plaintiff about the child's
behavior. Plaintiff stressed to the parent that the child could not leave the
classroom alone, for fear that she would injure herself. The parent took his
child into the hallway and spoke harshly to her twice.

u.   At that time, plaintiff had a meeting with Ms. Broadhurst, the Vice
Principal, and told her that she had spoken with the child's parents, and
had informed them of the child's disruptive behavior. Plaintiff even
offered that the parents should be allowed to sit with the child for a day, to
supervise her. Ms. Broadhurst agreed that the parents would be allowed to
come into the classroom to sit with the child in order to monitor her
behavior.

v.      At the end of that meeting, just as plaintiff was finished speaking with Ms.
        Broadhurst, they received a call stating that the child's mother was coming
        upstairs to the office, and that she was "irate." When the parent, Ms. Reese
        entered the office, she began verbally and physically assaulting plaintiff.
        The security guard had to pull the parent off of plaintiff in order to protect
        her.

w.      Thereafter, plaintiff returned to her classroom, even while she was shaken
        up.

x.      At that time, Ms. Broadhurst came to plaintiff's doorway and did not say
        anything to plaintiff and removed all the kids from her class.

y.      Shortly thereafter, a detective appeared at plaintiff's classroom door, and
        told her that a complaint had been lodged against her.

z.      On February 15, 2007, plaintiff was unlawfully arrested by Officer
        Mathew Pompeijou and charged with endangering the welfare of a child.

aa.     On information and belief, Principal Espinal-Pacheco contacted the police,
        as a way to retaliate and discriminate against her for her opposition to
        Principal Espinal-Pacheco's practices. Plaintiff was handcuffed and
        paraded in front of numerous teachers and students, solely as a way to
        humiliate her.

bb.     Plaintiff was detained at the police station for about four hours, and
        eventually informed by Officer Pomeijou that the matter was
        "unsubstantiated". Plaintiff was then released and told to report to 131
        Livingston Street on the following day.

cc.    In February 2007, plaintiff was re-assigned to the infamous "rubber room," where she sits, humiliated and despondent, and unable to teach.

dd.    Municipal defendant's mistreatment of plaintiff continued on March 30, 2007, when Andrew Gordon, the Director of Employee Relations at the Department of Education, wrote to plaintiff, and informed her that the BOE had decided place her on the Department's Ineligible/Inquiry List. Very few, if any, tenured teachers have been placed on this list for the specific conduct that plaintiff was alleged to have engaged in.

ee.    Thereafter on or about May 31, 2007, plaintiff received a letter from Principal Espinal-Pacheco requesting a meeting to discuss an "allegation of verbal abuse and corporal punishment." Prior to this letter, plaintiff had received no communication from defendants wanting to investigate this matter or to hear her side of the story. In fact, plaintiff was transferred to the rubber room, and placed on the Department's Ineligible/Inquiry List without being afforded any due process.

ff.    Indeed, the letter to plaintiff from defendant Espinal-Pacheco states that she (Espinal-Pacheco) had "evaluated the investigatory results." However, no investigation had taken place, as plaintiff had never been questioned about this matter.

gg.    Further, on June 25, 2007, plaintiff was informed by Theresa Europe, Deputy Counsel to the Chancellor that they had been "advised by Rafaela Espinal-Pacheco, Principal of P.S. 147…that probable cause ha[d] been found on the charges preferred against [plaintiff]".

hh.    In fact, plaintiff's record prior to the arrival of Espinal-Pacheco completely belies defendants' alleged legitimate reasons for the adverse actions taken against plaintiff.

ii.    On information and belief, Espinal-Pacheco would not have subjected plaintiff to the aforementioned mistreatment, but for plaintiff's race and plaintiff's opposition to actions that she reasonably viewed as being discriminatory, and because of her history of speaking out on matters of public concern.

13.    Moreover, plaintiff's rights with respect to being free of stigmatizing actions which damage his prospects for gainful employment and upward mobility in her chosen profession, and of being free from racially-motivated and retaliatory governmental actions, are clearly established, and reasonable persons employed by municipal defendants are aware of these rights, or have reasons to be so aware of these rights.

14.    As a further proximate result of defendants' illegal acts towards plaintiff, plaintiff has suffered a loss of earnings, bonuses and other employment benefits.

15.    As a further proximate result of defendants' illegal actions towards plaintiff, plaintiff has suffered impairment and damage to plaintiff's good name and reputation.

16.    As a further proximate result of defendants' illegal actions towards plaintiff, plaintiff has suffered mental anguish and emotional injury.

17.    As a further proximate result of defendants' illegal actions towards plaintiff, plaintiff has been unable to ameliorate her employment situation.

18.     The individual defendant's actions were done with reckless indifference to

plaintiff's protected rights, entitling plaintiff to punitive damages as against the individual

defendant.

V.     CAUSES OF ACTION

FIRST CAUSE OF ACTION

19.     Plaintiff hereby repeats and realleges each allegation in each numbered paragraph

above.

20.     By altering the terms, conditions and privileges of plaintiff's municipal

employment on account of her race, while acting under color of state law and pursuant to

municipal practice, policy and custom, defendants have violated the Equal Protection Clause of

the Fourteenth Amendment of the United States Constitution as made actionable through 42

U.S.C. Section 1983.

SECOND CAUSE OF ACTION

21.     Plaintiff hereby repeats and realleges each allegation in each numbered paragraph

above.

22.     By altering the terms, conditions and privileges of plaintiff's municipal

employment on account of her race and because of her opposition to what she reasonably

believed to be racial discrimination, defendants have violated  42 U.S.C. Section 1981.

THIRD CAUSE OF ACTION

23.     Plaintiff hereby repeats and realleges each allegation in each numbered paragraph

above.

24.     By recklessly undertaking stigmatizing governmental actions which adversely

affected plaintiff's ability to be gainfully employed in her chosen profession, defendants, acting

under color of state law and/or pursuant to municipal practice, policy and custom, have violated the Liberty Interest Clause of the Fourteenth Amendment, as made action under 42 U.S.C. Section 1983.

### FOURTH CAUSE OF ACTION

25.     Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

26.     By beginning a pattern of retaliation against plaintiff from the time that she spoke out against matters of public concern in connection with her campaign for the position of Chapter Leader, defendants, acting under the color of state law and pursuant to practice, policy and custom of such retaliation, have violated the First Amendment of the United States Constitution, as made actionable by 42 U.S.C. Section 1983.

### VI.     PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that this Court grant to her judgment containing the following relief:

a.     An award of damages to be determined at the time of trial to compensate plaintiff for lost financial opportunities, mental anguish, humiliation and embarrassment.

b.     An award of punitive damages to be determined at the time of trial as against the individual defendant;

c.     An award of reasonable attorney fees and the costs of this action and,

e.     Such other and further relief as this Court may deem just and proper.

Dated: Brooklyn, New York
       July 16, 2008

                    Respectfully Submitted,
                    Law Offices of Ambrose Wotorson

By _____

Ambrose W. Wotorson (AWW—2412)
26 Court Street
Suite 1811
Brooklyn, New York 11242

718-797-4861