UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

KATHRYN BLYTHE

                    Plaintiff,                                    **MEMORANDUM & ORDER**
                                                                  08-CV-2843(RRM)(CLP)

 - against -

THE CITY OF NEW YORK, THE NEW YORK
CITY DEPARTMENT OF EDUCATION,
RAFAELA ESPINAL-PACHECO, in her
individual capacity, VICKY BROADHURST, in
her individual capacity, OFFICER MATHEW
BIJOU, in his individual capacity, and
LIEUTENANT GALLAGHER, in his individual
capacity,

                    Defendants.
-----------------------------------------------------------X

ROSLYNN R. MAUSKOPF, United States District Judge.

On July 16, 2008, plaintiff Kathryn Blythe brought this action against the City of New

York, the New York City Department of Education ("DOE"), two employees of the DOE –

Principal Rafaela Espinal-Pacheco and Assistant Principal Vicky Broadhurst – in their individual

capacities (collectively "DOE defendants"), and New York Police Department ("NYPD")

Officer Bijou Mathew in his individual capacity.[1]  (Doc. No. 1.)  The Court granted plaintiff

leave to amend her complaint on May 6, 2009, and she filed an amended complaint on May 8,

2009, adding NYPD Lieutenant Gallagher as a defendant.[2]  (Doc. No. 16.)  Plaintiff's Amended

Complaint alleges race discrimination and retaliation in violation of 42 U.S.C. §§ 1981 and 1983,

and deprivation of a liberty interest in violation of § 1983 and the Fourteenth Amendment

against the DOE defendants; and false arrest and an unlawful strip search, in violation of §§ 1983

---

[1] There was apparently some confusion regarding the name of the arresting police officer.  Because
defendants contend in their Local Rule 56.1 statement that the officer's name is Bijou Mathew, and plaintiff does
not disagree, the Court refers to the arresting officer by that name.
[2] Plaintiff's amended complaint does not indicate Lieutenant Gallagher's first name.

and 1985, against all defendants.  Before the Court are defendants' motion for summary

judgment pursuant to Fed. R. Civ. P. 56 (Doc. No. 55) and plaintiff's motion to file a second

amended complaint (Doc. Nos. 37, 38).  Plaintiff opposes summary judgment.  (Doc. No. 49.)

For the reasons stated below, defendants' motion for summary judgment is GRANTED, and

plaintiff's motion to amend her complaint is DENIED.

## BACKGROUND

The following material facts are taken from the parties' Local Rule 56.1 statements, as

well as the affidavits and exhibits submitted in connection with defendants' motion for summary

judgment and plaintiff's opposition thereto.  The Court draws all factual inferences in favor of

plaintiff at the summary judgment stage.

### I.    Plaintiff's Teaching Career From 1985 Through 2005

Plaintiff Kathryn Blythe, who identifies herself as African American, began working for

the DOE as a per diem "Common Branches" elementary school teacher at P.S. 147 in 1985.  In

September 1995, plaintiff received her permanent license certification to teach Nursery,

Kindergarten, and Grades 1–6.  At the beginning of the 2004–2005 school year, Raphaela

Espinal-Pacheco, who identifies herself as a black Hispanic of Dominican descent, became the

principal of P.S. 147.

At the beginning of the 2004–2005 school year, Espinal-Pacheco told plaintiff she would

specifically be coming around to check on plaintiff's performance, and that if her work was not

satisfactory she could receive an "unsatisfactory" rating.  When plaintiff stated that she had

always had satisfactory evaluations and was therefore not concerned, Espinal-Pacheco responded

by threatening that she could "go after" plaintiff's teaching license if she wanted to.  (Pl.'s 56.1

(Doc. No. 50) at ¶ 35.)

Another incident occurred later that same school year, in January 2005, when an African American parent arrived at plaintiff's classroom shortly before the start of the school day in tears because Espinal-Pacheco had sent her son (who was not, and had never been, plaintiff's student) to the psychiatric ward at Woodhull Hospital.  (*See* Defs.' 56.1 (Doc. No. 56-1) at ¶¶ 42, 50–54; Letter of February 11, 2005 (Doc. No. 56 Ex. K); Blythe Dep. (Doc. No. 56 Ex. B) at 208–09; Espinal-Pacheco Dep. of Jan. 25, 2010 at 108–09.)  While plaintiff was trying to comfort the parent, Espinal-Pacheco observed the parent in plaintiff's classroom and asked the parent to leave, indicating that plaintiff had to attend to her class.  Plaintiff ignored Espinal-Pacheco, and asked the parent to come back at lunchtime, when plaintiff would have time to speak with her. Plaintiff and Espinal-Pacheco discussed this incident, along with other instances of misconduct by plaintiff, at a January 21, 2005 meeting at which plaintiff's union representative was present; Espinal-Pacheco memorialized that meeting in a February 11, 2005 disciplinary letter.

## A.  January 2005 Student Suspension Hearing Testimony

On January 25, 2005, plaintiff testified pursuant to a subpoena, at a Superintendent's Suspension Hearing of the student whose mother had visited plaintiff's classroom in January 2005.  Plaintiff believed this testimony was contrary to Espinal-Pacheco's wishes, because Espinal-Pacheco wanted the student to be suspended.  Plaintiff testified at the hearing that she believed the student was very bright and that, despite his behavioral problems, he should not be suspended or sent to a psychiatric ward.  (Blythe Dep. at 24–25.)  Plaintiff did not believe the student was being considered for suspension because of his race, and did not testify regarding any alleged discrimination against African American students at the Suspension Hearing.  (Defs.' 56.1 at ¶ 58; Blythe Dep. at 28.)  Plaintiff received a "satisfactory" rating for her performance during the 2004–2005 school year.  (Defs.' 56.1 at ¶ 60.)

### II.     2005–2006 School Year

#### A.   June 1, 2006 Disciplinary Meeting and June 19, 2006 Disciplinary Letter

Plaintiff and Espinal-Pacheco had further disciplinary encounters during the 2005–2006

school year.  On June 1, 2006, plaintiff met with Espinal-Pacheco, Assistant Principal

Broadhurst, and a teacher representative to discuss several instances of alleged misconduct by

plaintiff.  Espinal-Pacheco maintained that plaintiff was absent 21 times between September

2005 and May 2006, which was excessive; that plaintiff refused to set up a meeting regarding a

complaint of verbal abuse against her; and that plaintiff left a class unattended in a school

hallway on May 26, 2006 while covering for another teacher.  Regarding the May 26, 2006

incident, plaintiff claims that she was disciplined rather than a Hispanic teacher even though the

Hispanic teacher was also at fault.  Espinal-Pacheco memorialized this meeting in a letter dated

June 19, 2006.  (Defs.' 56.1 at ¶ 64–66.)

#### B.   June 2006 Campaign for Union Chapter Leader

In June 2006 – the same month as the disciplinary meeting and letter described above –

plaintiff ran for the position of union Chapter Leader.  While running for this position, plaintiff

spoke out publicly regarding perceived disparate treatment by Espinal-Pacheco of Hispanic and

African American parents and students, Espinal-Pacheco's interference with the PTA, and

"Department of Education cronyism."  Plaintiff has not indicated the content of these statements.

(*See* Compl. at ¶ 13(k); Blythe Aff. (Doc. No. 51 Ex. 29) at ¶ 14; Defs.' 56.1 at ¶ 68.)

Plaintiff points to two ways in which Espinal-Pacheco treated Hispanic parents more

favorably than African-American parents.  First, Espinal-Pacheco allegedly "favored" a group of

Hispanic parents running for membership on the school's Parent-Teacher Association over a

group of African American parents.  (Blythe Dep. at 196–200.)  Second, Hispanic parents were

allowed to come to plaintiff's classroom and talk about their children without interference from Espinal-Pacheco, but African American parents either were not allowed to visit classrooms or were abruptly asked to leave by Espinal-Pacheco.  (*See* Defs.' 56.1 at ¶¶ 69–73.)

Plaintiff recalled three Hispanic students whose guardians were freely allowed to visit her classroom – "Joseph's" grandmother, "Ricardo's" grandmother, and "Destiny's" mother or aunt. (Blythe Dep. at 196, 200–02.)  In contrast, plaintiff described two instances in which African American parents were "followed" by Espinal-Pacheco and asked to leave plaintiff's classroom. The first is the January 2005 incident, described above, in which a distraught mother came to plaintiff's classroom at the beginning of the school day.  In the second, which took place in March 2005 during "open school week" (a week where parents may tour the school and observe classes), a parent came to plaintiff's classroom to pick up her son's report card while plaintiff's students were in the room.  Espinal-Pacheco came to the classroom, asked what the parent was doing there, and instructed plaintiff to attend to her class.  Plaintiff then went into the hallway with Espinal-Pacheco and indicated that she wanted Espinal-Pacheco to stop harassing her and disrespecting her in front of students.  (Blythe Dep. at 211–12; *see* Compl. at ¶ 13(i); Blythe Aff. at ¶ 12; Defs.' 56.1 at ¶¶72–73.)

Plaintiff also alleges that African American students were often disciplined more harshly than Hispanic students, and specifically alleges that she "never observed students, other than African American students, being sent to psychiatric wards."  (Blythe Aff. at ¶ 11.)  Plaintiff does not point to specific instances, apart from the January 2005 incident, in which African American students were disciplined or referred for hospitalization.

Plaintiff received an "unsatisfactory" rating on her 2005–2006 performance evaluation, and other non-African American teachers also received unsatisfactory ratings during the 2005–

2006 school year.  Plaintiff appealed the U-rating, and the appeal was denied.  (Defs.' 56.1 at ¶¶ 77–83.)

### III.    2006–2007 School Year

On February 15, 2007, because one of plaintiff's students ("Student A") was being disruptive and repeatedly leaving the classroom, plaintiff requested that the school's parent coordinator contact Student A's father or mother.  Student A's father came to the school and met with plaintiff and Student A, who told her father in plaintiff's presence that plaintiff had scratched her when putting her back in her seat.  Later that day, plaintiff met with Assistant Principal Broadhurst to discuss Student A's behavior, as well as a past allegation by Student A's mother that plaintiff had spoken inappropriately to Student A.

Student A's mother was contacted by the father, and independently by another teacher, both of whom indicated that Student A was crying because plaintiff had thrown her into a chair earlier that day.  Student A's mother went to the school, where she saw that her daughter's shirt was ripped, and accused plaintiff of harming her child.  A heated confrontation ensued between the mother and plaintiff, and a school safety officer escorted plaintiff back to her classroom. (*See* Broadhurst Dep. (Doc. No. 56 Ex. H) at 77–78; § 3020-a Hr'g Tr. of Nov. 5, 2009 (Doc. No. 51 Ex. 21) at 202–05; Defs.' & Pl.'s 56.1 at ¶¶ 87–94.)

After learning of the allegations against plaintiff, Espinal-Pacheco reported the allegation of corporal punishment through the proper channels, including to the DOE's Emergency Information Center ("EIC"); and the DOE's Office of Special Investigations ("OSI").  The EIC operator informed Espinal-Pacheco that Student A's mother could call 911 because of the seriousness of the incident and the age of the student, and Espinal-Pacheco relayed this information to Student A's mother.  Espinal-Pacheco and Student A's mother then called 911

and reported the incident.  Student A's mother later filed a formal complaint with the NYPD against plaintiff for endangering the welfare of a child, among other things.  (Defs.' 56.1 at ¶¶ 95–99; § 3020-a Hr'g Tr. (Doc. No. 51 Ex. 24) at 852–54.)

Police Officer Bijou Mathew and Lieutenant Gallagher arrived at P.S. 147 shortly thereafter, in response to a police report that there was an assault in progress at P.S. 147.  Student A's mother, who was still at the school when the officers arrived,  informed the responding officers that plaintiff had "put her hands on the child and forced her back into her seat.  Numerous times."  (Defs.' 56.1 at ¶¶ 101–02.)  Officer Mathew saw "a little bit of redness" on Student A.  (*Id.* at ¶ 103.)  Officer Mathew arrested plaintiff at approximately 2:52 pm, and transported her to the 90th precinct.

While still handcuffed, plaintiff was placed in a jail cell with two other women for about 45 minutes.  (Pl.'s 56.1 at ¶ 107.)  Plaintiff was subjected to a strip search by an unidentified female police officer in a restroom near the jail cell, and was eventually moved from the jail cell into the precinct's juvenile room.  After being questioned by a detective and a representative from the Administration for Children's Services, plaintiff's arrest was voided and she was released at approximately 7:15 pm.  (Defs.' 56.1 at ¶¶ 106–12.)

A.  Plaintiff's Reassignment, Harassment Complaint, and Office of Equal
     Opportunity Complaint

Plaintiff received a letter dated the same day, February 15, 2007, informing her that she was being reassigned to the Region Eight Operations Center because of a serious allegation that had been made against her.  Dennis Boyles, a Confidential Investigator with the OSI, began investigating the corporal punishment allegation made by Student A's mother on or about February 27, 2007.  In connection with this investigation, Investigator Boyles interviewed plaintiff on March 28, 2007, at which time plaintiff denied the allegations of corporal

punishment but refused to answer additional questions on advice of her union representatives. The OSI concluded, in a memorandum dated April 9, 2007, that plaintiff had violated Chancellor's Regulations A 420 (prohibiting corporal punishment) and A 421 (prohibiting verbal abuse of students).  (Memorandum of April 9, 2007 (Doc. No. 56 Ex. CC).)  Plaintiff refused to meet with Espinal-Pacheco to discuss this substantiated allegation of corporal punishment, and Espinal-Pacheco sent plaintiff a letter on May 10, 2007 stating that, based upon the investigation, she had concluded that plaintiff committed an act of corporal punishment, which constituted unacceptable teacher conduct.  (Defs.' 56.1 at ¶¶ 113–24.)

Plaintiff filed a complaint of discrimination with the DOE's Office of Equal Opportunity, dated May 10, 2007.[3]  The OEO concluded that it was unable to assist plaintiff because she had not provided evidence that she was discriminated against based on her age, color, ethnicity, race, or other protected classes.  (Defs.' 56.1 at ¶¶ 125–26.)  On May 30, 2007, plaintiff received notice that she had been placed on the DOE's Ineligible/Inquiry list due to pending disciplinary charges.

### B. Section 3020-a Disciplinary Charges Against Plaintiff

In a notice dated June 22, 2007, plaintiff was served with disciplinary charges pursuant to New York Education Law ("NYEL") § 3020-a and the collective bargaining agreement between plaintiff's union (the United Federation of Teachers) and the DOE.  The charges alleged seven specifications against plaintiff: (1) excessive absences during the 2005–2006 school year; (2) leaving a class unsupervised on January 14, 2005; (3) failing to present a lesson plan when requested on January 14, 2005; (4) leaving a class unsupervised and failing to return to the

---

[3] Plaintiff complained of receiving harassing phone calls, "being threatened about observations," being placed in an isolated area of the school, not receiving help with problem students, having to move classrooms, having to carry two classes at a time, unfair workloads, meddling in union elections, "blowing the whistle," and being falsely arrested based on untrue allegations.

classroom when instructed to do so on January 18, 2005; (5) yelling at students repeatedly on September 5, 2006; (6) threatening to choke another teacher in front of students on April 15, 2007; and (7) corporal punishment of a student.  Plaintiff was notified in a letter dated June 25, 2007 that she would remain on suspension with pay pending the determination of these charges. (Defs.' 56.1 at ¶¶ 128–31.)

### IV.    Disciplinary Hearing and Decision

A disciplinary hearing was conducted pursuant to NYEL § 3020-a and the collective bargaining agreement over seven days in October and November, 2009, in which plaintiff was represented by counsel.  The hearing officer issued an Opinion & Award on May 11, 2010, finding plaintiff guilty of specifications 1 (excessive absences), 2 (leaving a class unsupervised on January 14, 2005), and 7 (corporal punishment); guilty in part of specification 4 (leaving a class unsupervised on January 18, 2005), dismissing the remaining specifications, and ordering that plaintiff be suspended without pay until the end of the 2010–2011 school year.  (Defs.' 56.1 at ¶¶ 132–39.)  The hearing officer made two specific findings of fact that are relevant here: (1) plaintiff was excessively absent during the 2005–2006 school year and did not prove that she was hospitalized during that time, and (2) plaintiff grabbed Student A on February 15, 2007 with sufficient force that she tore the collar of Student A's shirt and popped the buttons off the shirt.

On June 4, 2010, plaintiff sought, *pro se*, to vacate the arbitration opinion through a special proceeding pursuant to N.Y. C.P.L.R. Article 75.  Plaintiff alleged that (1) the hearing officer was biased, (2) the punishment was excessive, (3) the hearing officer and DOE committed fraud, corruption, and misconduct, and (4) the hearing officer violated § 3020-a's procedural requirements.  (*See* Pet. to Vacate Arbitration Award (Doc. No. 56 Ex. WW) at 17–22.)  The Department of Education cross moved to dismiss the petition.

Judge Cynthia S. Kern of the New York State Supreme Court, New York County, dismissed plaintiff's Article 75 petition in an order dated September 20, 2010. (Defs.' 56.1 at ¶¶ 141–42.) Judge Kern found that plaintiff "failed to provide any evidence demonstrating misconduct, bias, excess of power, or procedural defects;" that the Hearing officer's decision was rational and supported by adequate evidence; and that plaintiff's due process rights were not violated when the school board did not vote on the charges against her. (Judgment/Order of Sept. 20, 2010 (Doc. No. 56 Ex. XX) at 3–4.)

## V.     The Instant Action

Plaintiff commenced this action by filing a complaint on July 16, 2008, and filed an amended complaint on May 8, 2009. Plaintiff asserts the following claims against the DOE defendants: (1) race discrimination pursuant to 42 U.S.C. §§ 1981 and 1983; (2) violation of her right to due process pursuant to the Fourteenth Amendment and §1983; and (3) retaliation pursuant to the First Amendment and §1983. Plaintiff also asserts, against all defendants, a claim for false arrest and false imprisonment, in violation of the Fourth and Fourteenth Amendments and §§ 1983 and 1985.

On November 30, 2010, plaintiff moved for leave to file a second amended complaint adding a claim that her due process rights were violated because the hearing officer did not follow the procedures set out in § 3020-a.[4] On February 7, 2012, defendants moved for summary judgment. Plaintiff opposes summary judgment. Before the Court are plaintiff's motion to file a second amended complaint, and defendants' motion for summary judgment.

## DISCUSSION

## I.     Legal Standard for Summary Judgment

---

[4] This motion was terminated from the docket because it was docketed in contravention of the Court's individual rules.

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material facts exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed" and the court must draw all "justifiable" or reasonable inferences in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted, emphasis in original). The non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough

evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

## II.      State Action for Purposes of Claims Pursuant to § 1983

Plaintiff asserts four claims pursuant to § 1983: race discrimination, violation of due process, retaliation, and false arrest and imprisonment.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  The parties apparently do not dispute that all defendants acted under color of state law in taking the actions giving rise to this litigation, and the Court finds that all defendants acted under color of state law at all times relevant to plaintiff's claims because their actions were made possible only because of the authority given to them by state law.  *See Colombo v. O'Connell*, 310 F.3d 115, 117–18 (2d Cir. 2002) (quoting *West*, 487 U.S. at 49).  Whether plaintiff has sufficiently "allege[d] the violation of [rights] secured by the Constitution and laws of the United States" is discussed below in connection with each of plaintiff's claims.

## III.     §§ 1981 and 1983 Race Discrimination Claims

### a.   § 1981 Race Discrimination Claim

Plaintiff's Second Cause of Action alleges violations of § 1981 against the DOE defendants – however, to the extent plaintiff seeks to vindicate any independent rights under § 1981, she must do so via claims pursuant to § 1983.  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989); *Gladwin v. Pozzi*, 403 Fed. App'x 603, 605 (2d Cir. 2010) ("As the district court noted, Gladwin's § 1981 claims are encompassed by her § 1983 claims, and both are therefore analyzed under § 1983."); *Hogan v. Cnty. of Lewis, New York*, No. 7:11-CV-0754

12

(LEK/ATB), 2013 WL 936513, at *13 (N.D.N.Y. Mar. 8, 2013); *Ya-Chen Chen v. The City Univ. of New York*, No. 11-cv-0320(CM), 2011 WL 5419792, at *4–5 (S.D.N.Y. Nov. 9, 2011); *Whaley v. City Univ. of New York*, 555 F. Supp. 2d. 381, 400–01 (S.D.N.Y. 2008).  "In *Jett*, the Supreme Court held that the express action at law provided by § 1983 for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."  *Whaley*, 555 F. Supp. 2d at 400 (quoting *Jett*, 491 U.S. at 735) (internal quotation marks omitted).  This holding has been interpreted to apply to governmental entities as well as state actors sued in their individual capacities.  *Id.* (quoting *Roddini v. City Univ. of New York*, No. 02 Civ. 4640(LAP), 2003 WL 435981, at *5 (S.D.N.Y. Feb. 21, 2003)); *see Ya-Chen Chen*, 2011 WL 5419792, at *5; *Hogan*, 2013 WL 936513, at *13.[5]  Because plaintiff seeks only damages and, as noted above, all defendants are state actors, plaintiff must assert this claim through § 1983.

### b.  § 1983 Race Discrimination Claim

#### i.  Legal Standard

Plaintiff's § 1983 race discrimination claim is analyzed under the *McDonnell Douglas* burden-shifting framework.  *Ruiz v. Cnty. Of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)).  Plaintiff must first establish a prima facie case of race discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse

---

[5] The court in *Whaley* noted that, at the time of that opinion, some question existed as to whether § 1981(c), enacted in 1991, created an implied private right of action against state actors under § 1981, thereby statutorily overruling *Jett*, and that the Second Circuit had not yet considered the issue.  555 F. Supp. 2d. at 401 (citing *Anderson v. Conboy*, 156 F.3d 167, 178 n. 19 (2d Cir.1998)).  That court, however, ultimately followed other district courts in the Second Circuit by applying the Supreme Court's reasoning in *Jett*. *Id.*  The Court sees no reason to depart form the analysis in *Whaley*, particularly in light of (1) the Second Circuit's recent application of *Jett* without discussion of § 1981(c) in *Gladwin*, 403 Fed. App'x at 605, and (2) the fact that this Court has been unable to locate a Second Circuit decision resolving the issue noted in *Whaley*.

employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Id.* Once plaintiff meets this initial burden, the burden then shifts to defendant to offer a legitimate nondiscriminatory reason for the action. *Id.* at 492 (citing *Holcomb v. Iona College*, 521 F.3d 130, 140 (2d Cir. 2008)). If defendant does so, the burden shifts back to plaintiff to show that the legitimate nondiscriminatory reason is pretextual, and that the real reason for the adverse employment action was plaintiff's race. *Id.* (citing *Holcomb*, 521 F.3d at 141).

In support of her race discrimination claim, plaintiff points to three allegedly discriminatory adverse actions. First, plaintiff alleges that Espinal-Pacheco told plaintiff in September 2005 that she would be "specifically coming around to check on" plaintiff, and could go after plaintiff's teaching license if she wanted to. (Defs.' 56.1 at ¶ 34; Blythe Aff. at ¶ 8; Am. Compl. at ¶ 13(g).) Second, plaintiff alleges that Espinal-Pacheco treated Hispanic and African American parents and students differently by allowing Hispanic parents to meet with teachers in their classrooms for a longer period of time than African American parents, and asking African American parents to leave such meetings on two occasions. (Defs.' 56.1 at ¶¶ 69–73; Blythe Dep. at 196:20–22, 198:22–200:13, 200:19–212:3; Blythe Aff. at ¶¶ 9–10.) Third, plaintiff alleges that, when a Hispanic teacher left her class unattended on May 26, 2006, forcing plaintiff to cover the class, plaintiff was reprimanded rather than the Hispanic teacher. (Defs.' 56.1 at ¶ 65; Blythe Dep. at 244:10–25, 248:3–250:21, Pl.'s Opp. at 18–19.)

### ii.  Plaintiff's Prima Facie Case

Plaintiff has failed to make out a prima facie case because none of the above-cited actions constitutes an adverse employment action. For purposes of a § 1981 or § 1983 claim of race discrimination, an adverse employment action is a "materially adverse change" in the terms and

conditions of employment, which is defined as a change in working conditions that is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Walker v. City of New York*, No. 98 CV 2695(SJ), 2002 WL 31051534, at *4 (E.D.N.Y. July 22, 2002) (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)); *see Bermudez v. City of New York*, 783 F. Supp. 2d 560, 575–76 (S.D.N.Y. 2011) (quoting *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007)).  Such a change might be indicated by "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Walker*, 2002 WL 31051534, at *4 (quoting *Galabya*, 202 F.3d at 640).

Espinal-Pacheco's warning that she would be "checking on" plaintiff and could go after plaintiff's teaching license if she wanted to was not an adverse employment action because it did not "alter the terms and conditions of the plaintiff's employment in a materially negative way." *Chang v. Safe Horizon*, No. 03 Civ. 10100WHP, 2005 WL 2125660, at *9 (S.D.N.Y. Sept. 1, 2004), *aff'd*, 254 Fed. App'x 838.  The statement was merely a warning that inadequate performance could result in a negative review – it did not lead to any follow-up procedures or discipline, nor did it impact plaintiff's title, salary, benefits, or job responsibilities. *See Chang*, 2005 WL 2125660, at *9 (holding that, in analogous Title VII retaliation context, supervisor's written disciplinary warnings that plaintiff needed to improve performance, questioning by supervisors behind closed doors, and an attempt to access plaintiff's computer were not materially adverse employment actions); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 355 (S.D.N.Y. 2006) (holding that "[e]xcessive scrutiny, without more, does not constitute an adverse employment action" and citing cases).  *Contra Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 245 (N.D.N.Y. 2010) (holding that verbal and written warnings were materially

adverse because they initiated follow-up meetings and close monitoring of plaintiff's progress, and noted that failure to demonstrate improvement would lead to further disciplinary action).

Nor did Espinal-Pacheco's alleged disparate treatment of African American and Hispanic parents and students constitute an adverse employment action.  Plaintiff points to two instances in which Espinal-Pacheco asked African American parents to leave during conversations with plaintiff but admits that, in each circumstance, plaintiff's class was present when the parent came to her classroom and Espinal-Pacheco instructed plaintiff to attend to her class.  Therefore, even viewing the facts most favorably to plaintiff, these encounters were at most inconveniences and did not materially impact plaintiff's working environment.  *Hill*, 467 F. Supp. 2d at 355 ("[I]nconveniences do not constitute adverse employment actions).  Again, plaintiff has presented no evidence that her title, salary, benefits, or job responsibilities were impacted.  *See id.* at 354 ("Plaintiff must have experienced 'some attendant negative result, [such as] a deprivation of a position or opportunity.'") (quoting *Pimentel v. City of New York*, No. 00 CIV.326(SAS), 2002 WL 977535, at *4 (S.D.N.Y. May 14, 2002)).  Plaintiff has similarly presented no evidence that Espinal-Pacheco's "favoring" of a slate of Hispanic PTA candidates or disciplining a single African American student materially and adversely impacted her employment.

Finally, the discipline plaintiff suffered in connection with leaving another teacher's class unattended – including receiving a reprimand, attending a disciplinary meeting, and receipt of the June 19, 2006 disciplinary letter – was not a materially adverse change.  (*See* Blythe Dep. at 244:10–25, 248:3–250:21; Blythe Aff. at ¶ 18; Disciplinary Letter (Doc. No. 56 Ex. P); *see also* Defs.' & Pl.'s 56.1 at ¶¶ 64–65.)   These actions, however unpleasant or embarrassing they may have been for plaintiff, did not amount to "a change in working conditions . . . more disruptive

than a mere inconvenience or an alteration of job responsibilities." *Galabya*, 202 F.3d at 640. The disciplinary letter recounted several instances of plaintiff's allegedly insubordinate behavior, concluded that plaintiff's behavior was "uncooperative and unprofessional" and constituted "insubordination," and warned that the incidents detailed in the letter *may* lead to further disciplinary action, including an unsatisfactory rating and charges that could lead to termination. (Defs.' Ex. P.)  However, because the letter contained no indication of planned discipline or further action, a rational factfinder would have "no basis for concluding that plaintiff suffered any actionable harm as a result of the reprimand."  *Stembridge v. City of New York*, 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000) (finding that a reprimand that "contained a warning that repetition of improper behavior could result in disciplinary action but contained no indication of any planned discipline or further action" was not an adverse employment action).

Because plaintiff has failed to establish a prime facie case of race discrimination, defendants are entitled to summary judgment on plaintiff's race discrimination claim.

**IV.    Due Process Liberty Interest Claim**

In her Third Cause of Action, plaintiff argues that defendants imposed a reputation harm on her in violation of the liberty interest provision of the Fourteenth Amendment's Due Process clause by accusing her of corporal punishment; and that the process afforded her was inadequate because the § 3020-a hearing officer did not follow the procedures set out in § 3020-a in evaluating the charges.

The Second Circuit "has recognized that loss of one's reputation can . . . invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment."  *Guerra v. Jones*, 421 Fed. App'x 15, 18 (2d Cir. 2011) (quoting *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004)).  To prevail on

her claim that she was deprived of a liberty interest in her reputation without due process of law – a so-called "stigma-plus" claim" – plaintiff must prove (1) the utterance of a statement that is injurious to reputation, that is capable of being proved false, and that is claimed to be false; and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement. *Rausa v. Bd. Of Ed. Of the North Syracuse Cent. Sch. Dist.*, No. 5:11-cv-1152, 2012 WL 967052, at *10 (N.D.N.Y. Mar. 21, 2012) (citing *Monserrate v. New York State Senate*, 599 F.3d 148, 158 (2d Cir. 2010)).  Plaintiff's theory is that the allegedly false corporal punishment charges constituted the stigma, and the failure to follow the procedures set out in § 3020-a constituted the "plus."

Assuming that plaintiff has adequately alleged a violation of her reputation interest, her stigma-plus claim nonetheless fails because she received all the process she was due in the form of a properly conducted § 3020-a hearing.  *See Strong v. Bd. Of Ed. of Uniondale Union Free Sch. Dist.*, 902 F.2d 208, 212 (2d Cir. 1990) ("All the process that was due in this case has been provided.") (citing *Cleveland Bd. Of Ed. v. Loudermill*, 470 U.S. 532, 545–48 (1985)).  "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546; *see Adams v. New York State Ed. Dep't*, 752 F. Supp. 2d 420, 455 (2d Cir. 2010); *Strong*, 902 F.2d at 211 ("Under New York law a tenured teacher may be removed only pursuant to certain substantive and procedural safeguards, including notice and a full-blown adversarial hearing.").  The procedures of § 3020-a, when followed, are more than adequate to satisfy the Fourteenth Amendment's requirement of due process, and it is not disputed that plaintiff received a § 3020-a hearing spanning seven days, at which she was represented by counsel who called and examined numerous witnesses.  *Roemer v. Bd. Of Ed. of*

*City of New York*, 150 Fed. App'x 38, 40 (2d Cir. 2005) ("[Section 3020-a] sets out the procedures for challenging claims like the ones brought against Roemer and provides all the process due."); *Ramberran v. Dellacona*, No. 07-CV-304 (CBA), 2008 WL 905217, at *4 (E.D.N.Y. Mar. 31, 2008) (quoting *Montefusco v. Nassau Cnty.*, 39 F. Supp. 2d 231, 239–40 (E.D.N.Y. 1999)).

Plaintiff contends, however, that the procedures of § 3020-a were *not* followed, because (1) the hearing was not held within 60 days of the pre-hearing conference as required by § 3020-a(3)(c)(vi), (2) there was no finding of probable cause by the Board of Education as required by § 3020-a(2)(a), and (3) the hearing officer was biased against plaintiff.  With respect to the first argument, plaintiff has not demonstrated that she was prejudiced by any delay, as is required to vacate an arbitration award for untimeliness.  *Morrell v. New York City Dep't of Ed.*, No. 106761/2010, 2010 WL 5600939, 924 N.Y.S.2d 310, at *6 (N.Y. Sup. Ct. Dec. 3, 2010) (table) ("To vacate an arbitration award on grounds of untimeliness, a petitioner must demonstrate that he or she has suffered undue prejudice as a result of the alleged delay.") (citing *Scollar v. Cece*, 812 N.Y.S.2d 521 (N.Y. App. Div. 1st Dep't 2006)); *see Hayes v. New York City Dep't of Ed.*, No. 100744/09, 906 N.Y.S.2d 772, at *9 (N.Y. Sup. Ct. Nov. 11, 2009) (table).

Plaintiff's second and third arguments are barred by the doctrine of collateral estoppel because they were raised and rejected in plaintiff's Article 75 petition to vacate the arbitration award.  Collateral estoppel precludes relitigation of issues of fact and law actually litigated and resolved in a prior court determination when those issues were essential to the prior judgment, even if the issue recurs in the context of a different claim.  *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).  Federal courts, including in § 1983 actions, must give state-court factfinding preclusive effect whenever the courts of the state that entered the judgment would do so.  *Burkybile v. Bd.*

19

*of Ed. of the Hastingson–Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir. 2005) (citing

*Univ. of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986)); *Saunders v. New York City Dep't of Ed.*,

No. 07 CV 2725(SJF)(LB), 2010 WL 2816321, at *14 (E.D.N.Y. July 15, 2010), *modified on*

*reconsideration on other grounds*, 2010 WL 2985031.  "Under New York law, collateral

estoppel precludes a party from relitigating an issue of law when: (1) the issue in question was

actually and necessarily decided in a prior proceeding, and (2) the party against whom the

doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding."

*Saunders*, 2010 WL 2816321, at *18 (quoting *Vargas v. City of New York*, 377 F.3d 200, 205–06

(2d Cir. 2004).  The party asserting preclusion (here, defendants) carries the burden of

establishing the first element, whereas the party opposing preclusion (here, plaintiff) must

demonstrate the latter element.  *Id.* (citing *Evans v. Ottimo*, 469 F.3d 278, 281–82 (2d Cir.

2006)).

     Plaintiff raised identical claims relating to lack of probable cause and hearing officer bias

in her Article 75 petition.  (*See* Pet. to Vacate Arbitration Award at 12–14, 20–22.)  Those claims

were actually and necessarily decided by the Article 75 judge, who held that each claim lacked

merit.  (Judgment/Order of Sept. 20, 2010 at 3.)  Plaintiff has presented no evidence that she did

not have a full and fair opportunity to litigate her claims before the Article 75 court – in fact,

plaintiff submitted an extensive brief in support of her Article 75 petition, and the court issued a

written order specifically addressing her claims.  *See Saunders*, 2010 WL 2816321, at *18

("Plaintiff clearly had a full and fair opportunity to litigate her due process claims relating to the

Section 3020–a hearing in the [Article 75] proceeding.").  Because the Article 75 court

previously determined that the procedures employed in the § 3020-a hearing were fair, plaintiff's

allegation that those procedures were not followed cannot support her stigma-plus claim.  *See id.*;

*see also Batyreva v. New York City Dep't of Ed.*, No. 07 Civ. 4544(PAC)(DF), 2010 WL

3860401, at *15 (S.D.N.Y. Oct. 1, 2010) (adopting R&R) (holding that claim preclusion

precluded the court from reconsidering the fairness of a § 3020-a hearing because the Article 75

court decided that the hearing was fair).[6]  Plaintiff has therefore failed to raise a genuine issue of

material fact with respect to whether she was deprived of liberty in violation of the due process

clause, and defendants are entitled to summary judgment on that claim.[7]

## V.  §§ 1981 and 1983 Retaliation Claims

In her Second and Fourth Causes of Action, plaintiff argues that defendants violated §

1981 by retaliating against her in response to her opposition to perceived racial discrimination by

Espinal-Pacheco, and violated her First Amendment rights (via § 1983) by retaliating against

plaintiff for engaging in protected speech.

### a.  § 1981 Retaliation Claim

---

[6] Although some cases in this Circuit have refused to accord claim preclusive effect to Article 75 proceedings, those cases dealt with situations in which the claim sought to be precluded was outside the scope of the Article 75 proceeding. *See, e.g., Bottini v. Sadore Mgmt. Corp.*, 764 F.2d 116, 121 (2d Cir. 1985) (refusing to give claim preclusive effect to Article 75 proceeding with respect to Title VII claim because that claim was outside the scope of the underlying arbitration proceeding, and therefore also outside the scope of the Article 75 proceeding); *Halstead v. New York City Transit Auth.*, No. 1:99-CV-03450-CBA, 2002 WL 34438897, at *5–6 (E.D.N.Y. Dec. 30, 2002) (refusing to apply collateral estoppel because plaintiff did not raise "the same issues [in his Article 75 petition] that he now raises in his federal lawsuit," and because the Article 75 opinion did not clearly indicate which issues were actually litigated and decided).

[7] Although plaintiff highlights her status as a tenured teacher in arguing that she suffered a deprivation of a liberty interest, plaintiff does not allege, either in her complaint or in her opposition to defendants' summary judgment motion, that she had a protected *property* interest in continued employment as a tenured teacher. (*See* Pl.'s Opposition at 24–31.)  Plaintiff has therefore failed to properly plead a violation of her property interest in continued employment as a tenured teacher.  *See Huff v. West Haven Bd. Of Ed.*, 10 F. Supp. 2d 117, 122–23 (D. Conn. 1998).  Even assuming that plaintiff's passing reference to a property interest in her motion papers is sufficient to state such a claim, defendants would be entitled to summary judgment on that claim.  With respect to the period that plaintiff was assigned to the relocation center and suspended with pay, she was not deprived of a property interest.  *Adams v. New York State Ed. Dep't*, 752 F. Supp. 2d 420, 453 (S.D.N.Y. 2010) ("An employee who continues to be paid cannot 'sustain a claim for deprivation of property without due process' even if relieved from job duties.");  *Ramberran*, 2008 WL 905217, at *4 (holding that a suspension with pay does not require due process protection);  *Montefusco v. Nassau Cnty.*, 39 F. Supp. 2d 231, 239 (E.D.N.Y. 1999) (holding that plaintiff was not deprived of a property interest while he was suspended with pay);  *see O'Connor v. Pierson*, 426 F.3d 187, 200 (2d Cir. 2005) (holding that plaintiff was effectively suspended without pay, and therefore entitled to due process protections, when placed on unpaid sick leave).  Second, with respect to the period that plaintiff was suspended without pay, she received all the process she was due in the form of a full-blown § 3020-a hearing, as described *supra*.

Section 1981 "encompasses a complaint of retaliation against a person who has complained about a violation of another person's contract-related 'right.'" *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008). Such claims are analyzed under the *McDonnel Douglas* burden-shifting framework, outlined above with respect to plaintiff's race discrimination claim. *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001); *see Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citing *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). To state a prima facie case, plaintiff must adduce evidence that the she engaged in "protected activity," which under § 1981 encompasses complaints about a violation of another's contract-related rights on account of race. *Eugenio v. Walder*, No. 06-CV-4928 (CS)(GAY), 2009 WL 1904526, at *13 (S.D.N.Y. July 2, 2009) (citing *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)). "Any claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' . . . under which the plaintiff has rights." *Id.* (quoting *Domino's Pizza, Inc.*, 546 U.S. at 476); *see* 42 U.S.C. § 1981. To survive summary judgment, plaintiff must therefore present evidence of retaliation against her because she complained about a violation of another person's contract-related right. *See Rodriguez v. Int'l Leadership Charter Sch.*, No. 08 Civ. 1012(PAC), 2009 WL 860622, at *6 (S.D.N.Y. Mar. 30, 2009) (quoting *CBOCS West, Inc.*, 553 U.S. at 445).

Plaintiff alleges that she engaged in two instances of activity protected by § 1981: First, plaintiff testified at a January 2005 suspension hearing on behalf of the student Espinal-Pacheco sought to suspend. Second, plaintiff spoke out against Espinal-Pacheco's allegedly racist treatment of parents and students, punishment of students, interference with the PTA, and "DOE cronyism" in connection with her June 2006 campaign for Union Chapter Leader. Plaintiff also

points to two allegedly adverse employment actions: the June 2006 disciplinary letter, and the 911 call and subsequent disciplinary charges.

Plaintiff has not raised a genuine issue of material fact regarding whether the above instances of speech constituted protected activity pursuant to § 1981 because her submissions are utterly devoid of any suggestion that defendants violated a contract right possessed either by plaintiff or by the African American students or parents of P.S. 147.   At the suspension hearing, plaintiff did not testify regarding the contract rights of African American students and parents, or even regarding perceived discrimination against such students and parents.  (Pl.'s & Defs.' 56.1 at ¶58.)  In fact, when asked at her deposition whether her testimony addressed what she perceived as discrimination against African American students, plaintiff replied "absolutely not." (Blythe Dep. at 25–26, 28.)  Because plaintiff has presented no evidence demonstrating that this testimony constituted a complaint regarding a violation of her own, or anyone else's, contract rights, the testimony cannot constitute protected activity pursuant to § 1981.  *See Domino's Pizza, Inc.*, 546 U.S. at 476 (holding that any claim brought under § 1981 must identify an impaired contractual relationship); *Rodriguez*, 2009 WL 860622, at *6 (granting motion to dismiss because plaintiff did not allege a violation of students' contract-related rights based on race or national origin); *Foxworth v. American Bible Society*, No. 03 Civ. 3005(MBM), 2005 WL 1837504, at *4 n.5 (S.D.N.Y. July 28, 2005), *aff'd* 180 Fed. App'x 294, 294–95 (2d Cir. 2006).

Plaintiff's campaign statements regarding what she perceived as disparate treatment of African American students and parents was not protected activity for the same reason – plaintiff neither alleged, nor presented any evidence, that she complained that any disparate treatment infringed students' or parents' contract rights based on race.  Perceived racial discrimination is

not "protected" under § 1981 if it "did not impair such students' rights to enter into contracts or rights under any existing contractual relationships." *Eugenio*, 2009 WL 1904526, at *13 (granting summary judgment against school staff who complained about racial discrimination against African American students but did not present evidence of a violation of students' contract rights, and citing cases); *DiStiso v. Town of Wolcott*, No. 3:05cv01910 (PCD), 2006 WL 3355174, at *7 (D. Conn. Nov. 17, 2006) ("[B]ecause Plaintiff has not alleged any contractual relationship between [a student] and any of the Defendants [the local board of education, the town, and school officials], her claims brought pursuant to § 1981 fail to state a claim upon which relief can be granted.").

Plaintiff has therefore failed to make out a prima facie case of retaliation pursuant to § 1981, and defendants are entitled to summary judgment on that claim.

### i. Defendants' Legitimate Nonretaliatory Reason

Even assuming that plaintiff made out a prima facie case of § 1981 retaliation, defendants have presented evidence showing legitimate, non-retaliatory reasons for both the disciplinary letter, and the 911 call and subsequent filing of disciplinary charges against plaintiff. *See Isaac v. City of New York*, 271 Fed. App'x 60, 63 (2d Cir. 2008) (citing *Jute*, 420 F.3d 179–80). The disciplinary letter was written because plaintiff was, in fact, excessively absent during the 2005–2006 school year without justification. The hearing officer at plaintiff's § 3020-a hearing – whose factfinding is entitled to preclusive effect – determined that plaintiff was absent 18 times during the 2005–2006 school year and that those absences were excessive and not excused. *Burkybile*, 411 F.3d at 311 (citing *Elliott*, 478 U.S. at 798–99) (holding that factfinding in § 3020-a hearing must be given preclusive effect); *see Hunt v. Klein*, 476 Fed. App'x 889, 891 (2d Cir. 2012); *Roemer*, 150 Fed. App'x at 39; *Saunders*, 2010 WL 2816321, at *15–18; *Page v.*

*Liberty Cent. Sch. Dist.*, 679 F. Supp. 2d 448, 452 (S.D.N.Y. 2010) (noting that plaintiff did not dispute the fact that findings reached in her § 3020-a hearing were entitled to preclusive effect in federal court); (Arbitrator's Opinion & Award (Doc. No. 56 Ex. SS) at 13–15.)

Defendants have also proffered a legitimate nonretaliatory reason for the 911 call and subsequent disciplinary charges.  Student A and her mother accused plaintiff of grabbing Student A with sufficient force to rip her shirt and pop the buttons and, after Espinal-Pacheco reported the incident to the EIC, the EIC operator informed her that Student A's mother could call the police because of the age of the student and the seriousness of the incident.  Moreover, the OSI later substantiated this allegation after conducting an investigation, and the hearing officer – after reviewing extensive testimony – found that plaintiff did grab Student A, leaving marks on Student A's shoulder.  (Arbitrator's Opinion & Award at 13–15, 34.)  These determinations rebut any inference that defendants' actions were taken in retaliation for opposition to protected activity.

### ii.  Plaintiff's Showing of Pretext

Plaintiff further argues that the allegations in the June 19, 2006 disciplinary letter – which stated that plaintiff was excessively absent, left a class unattended, and conducted herself in an unprofessional manner – were pretextual because (1) the letter was written a year after the meeting it purported to describe, and (2) plaintiff submitted medical documentation for her absences.  Plaintiff also alleges that the February 15, 2007 911 call was pretextual because Student A's claims were "false or exaggerated," and therefore Espinal-Pacheco used these occasions as opportunities to target plaintiff because of her testimony and campaign statements.  Although it is not necessary to reach this prong of the *McDonnell Douglas* test in light of the fact that plaintiff failed to make out a prima facie case, the Court nonetheless discusses it because

25

plaintiff's claim is premised almost entirely on her argument that defendants' actions were pretextual.

To show that defendants' asserted reasons were pretextual, plaintiff need not show that an illegitimate reason was the *sole* motivating factor for the adverse actions, *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997), but need only show that "retaliation was a substantial reason for [defendants'] adverse actions." *Jute*, 420 F.3d at 180; *see Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

Plaintiff first argues that the June 19, 2006 letter in fact  memorialized a meeting that took place in *June 2005* – a full year before the letter was written or presented to plaintiff.  This delay, plaintiff claims, indicates that Espinal-Pacheco did not write the letter until plaintiff began campaigning, and that the letter was therefore in retaliation for her campaign statements.  This argument is clearly belied, however, by the letter itself.  (Disciplinary Letter of June 19, 2006 at 2; *see* Blythe Aff. at ¶ 16).  The letter itself is dated June 19, 2006 on the first page and June 16, 2006 on the second page; handwritten notations made on the letter reflect dates of June 19, 2006 and June 21, 2006.  Plaintiff's argument is premised on the fact that the letter's first paragraph states that the disciplinary meeting took place on June 1, 2005.  This date, however, is clearly a typo.  The letter discusses misconduct that took place between September 2005 and May 2006, and Espinal-Pacheco and plaintiff could not possibly have discussed such conduct at a June 2005 meeting (before the conduct occurred).  In addition, plaintiff testified in her deposition that the meeting referenced in the letter took place in June 2006, not June 2005.  (Blythe Dep. at 253.) Although the Court is mindful that it must not resolve factual disputes on summary judgment and must draw all reasonable inferences in the nonmovant's favor, the above facts demonstrate that

no reasonable jury could find that the letter memorializes a June 1, 2005 meeting, but instead referred to a meeting that took place on June 1, 2006.  Therefore, the letter was not written belatedly and its date does not support an inference of pretext.

Plaintiff also argues the accusations of excessive absences in the disciplinary letter were groundless because plaintiff was hospitalized for many of those dates; therefore, the charge of excessive absences was pretextual and retaliatory.  To support this claim, plaintiff cites to testimony from her § 3020-a hearing.  (*See* Pl.'s 56.1 at ¶ 64.)  However, after carefully reviewing that testimony, the hearing officer determined that, although more than half of those absences were medically documented, plaintiff failed to prove that she was hospitalized, or if she was hospitalized the dates of any such hospitalization.   (Arbitrator's Opinion & Award of May 11, 2010, at 13–14.)  Moreover, the hearing officer found that Espinal-Pacheco suggested that plaintiff consider taking FMLA leave, and that plaintiff declined to do so.  (*Id.* at 14–15.)  The hearing officer concluded that plaintiff was guilty of excessive absences and that those absences were not excused.  (*Id.* at 15.)  Because these findings are entitled to preclusive effect, *see Burkybile*, 411 F.3d at 313, the Court is unable to conclude that plaintiff was hospitalized or that her absences were otherwise excused.

Plaintiff has therefore failed to show that defendants' legitimate nondiscriminatory reasons were pretextual, and summary judgment is warranted in favor of defendants on plaintiff's § 1981 retaliation claim.

### b.  First Amendment Retaliation Claim

To state a prima facie claim of First Amendment retaliation under § 1983, plaintiff must offer some tangible proof that (1) her speech was constitutionally protected; (2) she suffered an adverse employment action; and (3) a causal relationship between the two existed in that the

speech was a substantial or motivating factor for the adverse employment action. *Burkybile*, 411 F.3d at 313 (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)). Even if plaintiff makes out a prima facie case, defendant can still prevail on a motion for summary judgment if it shows that it "would have taken the same adverse employment action 'even in the absence of the protected conduct.'" *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251–52 (2d Cir. 2006).

Plaintiff argues that defendants violated her First Amendment rights by retaliating against her based on protected speech, pointing to the same two instances of speech underlying her § 1981 retaliation claim (the suspension hearing testimony and campaign statements) and the same two employment actions[8] (the June 19, 2006 disciplinary letter and February 15, 2007 911 call and arrest).

Plaintiff has failed to raise a genuine issue of material fact regarding a causal link between the suspension hearing testimony and either the disciplinary letter or the 911 call. A plaintiff can demonstrate a causal connection "indirectly by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Gangadeen v. City of New York*, 654 F. Supp. 2d 169, 184 (S.D.N.Y. 2009) (quoting *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004)). A close temporal connection between plaintiff's speech and the employment action may establish causation when the temporal proximity is "very close," and the Second Circuit has prescribed no bright line beyond which an inference of causation is not permitted. *Gangadeen*, 654 F. Supp. 2d at 184 (quoting *Clark*

---

[8] Although the Court held *supra* that the disciplinary letter was not materially adverse for purposes of plaintiff's discrimination claim, a less stringent standard for what constitutes an adverse employment action applies to First Amendment retaliation claims. An employment action is adverse for First Amendment retaliation purposes if it "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Burkybile*, 411 F.3d at 313 (quoting *Washington v. Cnty. of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004)). Under this lower standard, the disciplinary memo and 911 call are both likely adverse. *See Washington*, 373 F.3d 310 (holding that the threat of administrative disciplinary proceedings and a thirty-day suspension without pay constituted adverse employment actions for First Amendment retaliation purposes).

*Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  "Nevertheless, a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link.  Instead, he must produce some tangible proof to demonstrate that his version of what occurred was not imaginary."  *Id.* (quoting *Cobb*, 363 F.3d at 108) (internal quotation marks omitted).

Plaintiff has presented no evidence whatsoever that the testimony was a "substantial or motivating factor" behind either the letter or the 911 call.  Plaintiff merely asserts that Espinal-Pacheco wanted to "get back at" plaintiff for testifying against her wishes – an unsupported allegation that is wholly insufficient to raise a genuine issue of material fact.  *See Scotto*, 143 F.3d at 114 (noting that the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation.").  Moreover, the suspension hearing testimony  took place nearly a year and a half before the disciplinary letter, and more than two years before the 911 call, and is thus far too temporally distant from the letter and 911 call to imply causation because of a close temporal link.  *See Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011) (holding that a delay of six weeks between an employer learning of plaintiff's speech and taking an adverse employment action supported an inference of causation).

Plaintiff has also failed to demonstrate that the campaign statements were a "substantial or motivating factor" behind the disciplinary letter or the 911 call.  Although the disciplinary letter was written and presented to plaintiff shortly after her campaign statements critical of Espinal-Pacheco, plaintiff has presented no evidence to show that the alleged causal connection between the campaign statements and the letter was "not imaginary."  First, plaintiff has presented no evidence respecting the contents of her campaign statements, and merely asserts that she "spoke out" regarding what she believed to be disparate treatment of African Americans and Hispanics by Espinal-Pacheco.  *See Gangadeen*, 654 F. Supp. 2d at 189 (noting that, where

plaintiff did not specify the contents of allegedly protected speech, it was difficult to assess whether that speech was protected).  Moreover, plaintiff has presented no evidence beyond her own speculation that the campaign statements were a motivating factor behind the disciplinary letter.  In fact, the disciplinary letter simply memorialized a June 1, 2006 disciplinary meeting at which Espinal-Pacheco and plaintiff discussed plaintiff's alleged misconduct, all of which took place well before the campaign statements were made.  Because Espinal-Pacheco had already contemplated disciplining plaintiff with respect to these incidents of misconduct, composing and presenting the disciplinary letter memorializing a prior meeting is "no evidence whatever of causality." *Id.* (quoting *Clark Cnty. Sch. Dist.*, 532 U.S. at 272).  Rather than supporting an inference of discriminatory animus, this chronology shows that Espinal-Pacheco had already commenced the process of disciplining plaintiff before she made any campaign statements, and that plaintiff's prior misconduct (rather than the campaign statements) gave rise to the letter.

Likewise, plaintiff has presented no evidence suggesting a causal link between the campaign statements and the 911 call.  In addition, the 911 call took place eight months after the campaign statements, a time period that numerous courts have concluded is too remote to support an inference of causation, although other courts have held that even longer delays supported an inference of causation.  *See Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554–55 (2d Cir. 2001) (citing cases).  The Court need not decide whether an eight month period is sufficient because, for the reasons described above in connection with plaintiff's discrimination claim, defendants have demonstrated that they would have called 911 without respect to plaintiff's campaign statements because plaintiff was accused of corporal punishment by a student and parent, a charge that was later substantiated.  *See*

*Cotarelo*, 460 F.3d at 251–53.  Defendants are therefore entitled to summary judgment on plaintiff's First Amendment retaliation claim.

## VI.   § 1983 False Arrest/False Imprisonment Claim

Plaintiff alleges that she was falsely arrested and imprisoned, and was subjected to an unnecessary and humiliating strip search in violation of §§ 1983 and 1985.[9]

Under both § 1983 and New York law, the elements of a false imprisonment claim are "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (citing *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992) (The elements of a claim of false arrest under § 1983 are "substantially the same" as the elements of a false arrest claim under New York law.").  If probable cause existed for the arrest, the arrest is "otherwise privileged" and the fourth prong is not satisfied.  *Singer*, 63 F.3d at 118–19 (citing *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).

Because probable cause existed for plaintiff's arrest, the arrest is privileged and plaintiff cannot make out a prima facie claim of false imprisonment.  Information provided by an identified citizen accusing another individual of committing a specific crime is sufficient to provide the police with probable cause to arrest.  *See People v. Lacen*, 546 N.Y.S.2d 378 (N.Y. Sup. Ct. 1989) (quoting *People v. Douglas*, 526 N.Y.S.2d 544 (N.Y. Sup. Ct. 1988)); *People v. Cruz*, 526 N.Y.S.2d 979 (N.Y. Sup. Ct. 1988).  Here, an identified individual (Student A's mother) called 911 and reported that plaintiff had put her hands on Student A and forced her

---

[9] Although plaintiff alleges both false arrest and false imprisonment, false arrest is a species of false imprisonment and the two claims are analyzed in the same way.  *See Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).

back into her seat numerous times.  (*See* Mathew Dep. (Doc. No. 56 Ex. W) at 12:10–13:24.)

After the officers arrived, they corroborated the information contained in the 911 call: the child

complained of "a little bit of pain," and the officers observed "a little bit of redness."  (*Id.*)

These facts were sufficient to give the officers probable cause to arrest plaintiff.[10]  *See also*

*Mackenzie v. Cnty. Of Nassau*, 46 Fed. App'x 22, 23 (2d Cir. 2002) (holding that "a statement

that [plaintiff] was one of the participants in an assault and obvious injuries to the victim," taken

together, established probable cause to arrest plaintiff for assault).

## VII.   §§ 1983/1985 Unlawful Strip Search Claim

Plaintiff's unlawful strip search claim must also be dismissed because the Court cannot

grant relief on this claim against the defendants named in this lawsuit.  Plaintiff is correct that

strip searches of persons arrested on misdemeanor charges are illegal absent reasonable suspicion

that the person is concealing contraband or weapons.  *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir.

1986).  Plaintiff has not, however, sued the NYPD, the county, or the officer who allegedly

conducted the strip search.  *See, e.g.*, *id.* at 802–03 (holding county liable for enforcing an

unconstitutional strip search policy, and holding Sherriff liable as a policymaker for

promulgating that policy).  In addition, the City of New York cannot be liable for the strip search

because plaintiff has neither alleged nor provided any evidence of a city-wide policy or practice

of unconstitutional strip searches.  *Harper v. City of New York*, No. 11 Civ. 4333(CM), 2013 WL

432599, at *2 (S.D.N.Y. Jan. 21, 2013) (holding that the City of New York was not a proper

defendant for claims of false arrest and malicious prosecution because plaintiff did not allege a

*Monell* claim); *see Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690 (1978).

---

[10] In addition, for the reasons stated *supra*, plaintiff is precluded from challenging the fact that she grabbed the child based on the § 3020-a hearing officer's determination that "[plaintiff] grabbed a first grade child with sufficient force that she tore the collar of her shirt and popped the buttons.  She grabbed the child with sufficient intensity that she left marks on the student's shoulder."  (Arbitrator's Opinion & Award at 34.)  This factual determination contributes to the existence of probable cause.

Espinal-Pacheco and Broadhurst had nothing to do with the strip search, and therefore cannot be held liable for its alleged unconstitutionality. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).  Finally, plaintiff has not alleged that Officer Mathew or Lieutenant Gallagher had any personal involvement in the strip search, and has not sued the officers who did participate in the search.  The false arrest claim must therefore be dismissed against Mathew and Gallagher as well.  *Harper*, 2013 WL 432599, at *2 ("The individual police officers who arrested Plaintiff would be proper defendants for the false arrest and malicious prosecution claims, but [p]laintiff has sued no police officers.").

Defendants are also entitled to summary judgment with respect to plaintiff's claim for conspiracy to violate civil rights under § 1985(3).  The elements of such a claim are (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is deprived of any right of a citizen of the United States. *Brown v. City of Oneonta, New York*, 221 F.3d 329, 341 (2d Cir. 2000).  The conspiracy must be motivated by racial animus.  *Id.* Plaintiff has offered no evidence whatsoever of a conspiracy to falsely arrest or imprison her, or that her arrest and imprisonment were motivated by racial animus.  *See id.*

## VIII.   Plaintiff's Motion to Amend Her Complaint[11]

---

[11] Plaintiff filed a motion to amend her complaint on November 30, 2010, which was terminated from the docket because it was docketed in contravention of the Court's individual rules.  Thereafter, plaintiff neither submitted a new motion to amend her complaint nor presented any legal argument in her opposition to summary judgment respecting the motion to amend.  The Court has therefore referred to plaintiff's incorrectly filed motion of November 30, 2010 to glean plaintiff's grounds for seeking leave to amend, and in determining that any amended complaint would be futile.

Plaintiff moves to amend her complaint to add a separate due process claim challenging the § 3020-a hearing on the same grounds she raised in her due process liberty interest claim. Allowing plaintiff to add a separate due process claim challenging the § 3020-a hearing would be futile because the Court has already considered and rejected these arguments in ruling on plaintiff's existing due process claim. *See Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 87 (2d Cir. 2002) ("Undue delay, bad faith or dilatory motive on the part of the movant . . . or futility of amendment will serve to prevent an amendment prior to trial.") (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

### IX.   Defendants the City of New York and the Department of Education

Plaintiff's complaint also names the City of New York and the DOE as defendants.  (Am. Compl. at ¶ 4.)  Claims under § 1983 can be brought against a municipality or municipal agency only when the municipality's official policy or practice causes the violation, and plaintiff has neither alleged nor provided any evidence of an official policy or practice of the City or the DOE.  *See Monell*, 436 U.S. at 694.  Therefore, although the Court has already determined that none of plaintiff's claims have substantive merit against any defendant, summary judgment is further warranted against the City of New York and DOE because plaintiff has not raised a genuine issue of material fact with respect to her *Monell* claim.

### X.   Defendant Lieutenant Gallagher

The docket indicates that Lieutenant Gallagher was never properly served pursuant to Fed. R. Civ. P. 4 and has not entered an appearance in this case, and plaintiff has offered no reason why the Court should extend the time to serve.[12]  In addition to the reasons given above, all claims against Gallagher are therefore dismissed for failure to serve process.

---

[12] Gallagher apparently has never been served, appeared, or otherwise participated in this litigation, which began when plaintiff filed her complaint on July 16, 2008.  Docket Number 25 ordered plaintiff to serve Gallagher

**CONCLUSION**

For the reasons stated above, defendants' motion for summary judgment is GRANTED in its entirety, and plaintiff's motion to amend her complaint is DENIED.  The Clerk of Court shall enter judgment accordingly, and close this case.

SO ORDERED.

Dated: Brooklyn, New York
     August 5, 2013

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge

---

by December 18, 2009, and no docket entry since that date reflects completion of service.  The Court therefore dismisses plaintiff's claims against Gallagher for failure to effect service by December 18, 2009, as specified in Magistrate Judge Pollak's November 30, 2009 order.